UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DORIS CONRAD, | ) |
| | ) No. 16 CV 8624 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| NANCY A. BERRYHILL, Acting Commissioner, Social Security Administration,[1] | ) |
| | ) |
| | ) June 5, 2017 |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

Doris Conrad seeks disability insurance benefits ("DIB") and supplemental security income ("SSI") based on her claim that she is disabled by seizures. After an Administrative Law Judge ("ALJ") denied her applications for DIB and SSI and the Appeals Council declined review, Conrad brought this lawsuit seeking judicial review of the denial. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Conrad's motion is denied and the government's is granted:

**Procedural History**

Conrad filed her DIB and SSI applications in January 2013 claiming a disability onset date of November 30, 2012. (Administrative Record ("A.R.") 14-16.) After her claims were denied initially and upon reconsideration, (id. at 102-05, 109-

---

[1] Nancy A. Berryhill became the Acting Commissioner on January 23, 2017. Pursuant to Federal Rule of Civil Procedure 25(d), she is automatically substituted as the named defendant in this case.

14), Conrad sought and was granted a hearing before an ALJ. That hearing took place on February 5, 2015. (Id. at 30-65.) On April 24, 2015, the ALJ issued a decision finding that Conrad is not disabled and, therefore, not entitled to DIB or SSI. (Id. at 14-25.) When the Appeals Council declined review, (id. at 1-3), the ALJ's decision became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Conrad filed this lawsuit seeking judicial review of the Commissioner's final decision, *see* 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 9).

## Facts

From 1991 through 2010, Conrad worked full-time as a cook at a fast food restaurant. (A.R. 199.) She asserts that she was terminated in 2010 and has not worked since. Conrad was represented by counsel at her hearing before the ALJ where she presented documentary and testimonial evidence in support of her claim that she is disabled as a result of epilepsy, obesity, mood swings, and depression. (See R. 17, Pl.'s Mem. at 2.)

**A.   Medical Evidence**

In November 2012 Conrad visited Provident Hospital of Cook County complaining of back pain. (A.R. 271-74.) She reported a month of worsening back pain, but was able to walk to the emergency room. She also requested refills for seizure and back pain medications. (Id. at 272.) Conrad reported no recent seizure activity and had no other complaints. (Id.) She was sent home with refills for her medications and educational materials discussing back pain. (Id. at 274.)

2

In January 2013 Conrad made an appointment with Dr. Awais Azmat for treatment related to seizures. (Id. at 275.) Conrad reported that she was diagnosed with seizures in her twenties and that she had been "seizure free for about 3 months." (Id.) She reported being compliant with her medications and that she was not experiencing other problems, including anxiety, depression, mania, suicidal ideations, or delusions. (Id. at 275-76.) In April 2013 Conrad again saw Dr. Azmat, this time for headaches. (Id. at 286.) She reported that she had not experienced a seizure for a month, she was compliant with her medications, and she could relieve her headache symptoms with analgesics. (Id.)

Between February and June 2013, Drs. James Madison and Charles Kenney submitted four Disability Determination Explanation ("DDE") forms regarding Conrad. (Id. at 66-79, 82-99.) On each DDE form the physicians reported that a consultative examination was not required. (See id. at 68, 75, 85, 94.) Drs. Madison and Kenney both noted that Conrad's seizure medication effectively prevented seizures and that her impairments did not preclude work-based activity. (Id. at 69, 76, 86, 95.) They both opined that Conrad had no exertional limitations but had postural limitations related to climbing ladders, ropes, and scaffolds. (Id. at 69, 76, 86-87, 95-96.) Each of them found Conrad capable of work, including heavy duty jobs, and noted that she was not limited to unskilled work. (Id. at 71, 78, 88-89, 97-98.)

Between July 10 and July 15, 2013, Conrad was hospitalized at St. Bernard Hospital. (Id. at 259-60.) She was diagnosed with pulmonary embolism, discharged

3

with a prescription for Warfarin, and instructed to follow up with her primary physician within three days. (Id. at 301-05.) Conrad saw Dr. Azmat three days later as instructed. (Id. at 395-97.)

Then in August 2013 Conrad was admitted to Jackson Park Hospital after complaining of dizziness and general weakness. (Id. at 327-28.) Conrad reported that she lived alone and denied mental illness. (Id. at 332, 336.) She also reported that her last seizure occurred a month earlier. (Id. at 333.) A carotid Doppler test showed minimal scattered plaque with normal flow in the vertebral arteries. (Id. at 339-40.) Echocardiogram results were "probably consistent with the diagnosis of hypertensive heart disease." (Id. at 341.) A head CT scan did not reveal any "acute intracranial abnormality." (Id. at 342.) Last, a series of x-rays produced generally unremarkable findings, but results were consistent with pulmonary emboli. (Id. at 343-47.) Conrad was released without any restrictions. (Id. at 327.)

In September 2013 Conrad requested refills for her medication at the Cook County Health and Hospitals System. (Id. at 399.) The records note "no sign of impending seizures." (Id.) Neurologic and psychiatric symptoms were negative, and Conrad had no other complaints beyond her request to have her prescriptions filled. (Id. at 400.) Her neurologic system review notes state that she was "[a]lert and oriented to person, place, time, and situation, normal motor observed, normal speech observed, normal condition observed." (Id. at 401.) Her psychiatric system review notes also state that she was "[c]ooperative, appropriate mood [and] affect, normal judgment." (Id.)

4

In November 2013 Conrad saw Dr. Azmat for a follow-up visit. (Id. at 392.) Conrad was out of her seizure medication and reported that she had one seizure since her last appointment, but had "no acute complaints." (Id.) Conrad also asked Dr. Azmat to complete disability-related paperwork. (Id.) Dr. Azmat completed a Physical Residual Functional Capacity ("RFC") questionnaire and reported that she had been treating Conrad for one year and that Conrad suffers from a seizure disorder and pulmonary embolism. (Id. at 307-09.) Dr. Azmat reported that pain, dizziness, and fatigue were not applicable to Conrad's RFC. And while Dr. Azmat noted that Conrad has anxiety, he opined that there was no indication of depression, somatoform disorder, personality disorder, or other psychological factors affecting her physical condition. (Id. at 307.) Dr. Azmat estimated that: (1) Conrad would experience pain rarely; (2) she could sit for more than two hours consecutively without needing to get up; (3) she could stand for more than two hours consecutively without needing to sit; (4) she could both sit and stand for about four hours per work day; (5) she did not need to shift positions between sitting, standing, or walking and had no need to take unscheduled breaks; and (6) she could lift up to 20 pounds rarely, 10 pounds occasionally, and less than 10 pounds frequently. (Id. at 307-08.) Dr. Azmat gave Conrad a fair prognosis. (Id. at 307.) In the section instructing the doctor to describe any limitations, including psychological limitations, that would affect Conrad's "ability to work at a regular job on a sustained basis," Dr. Azmat did not limit Conrad's ability to perform a regular job in any way. (Id. at 309.)

In March 2014 Dr. Azmat saw Conrad for another follow-up visit. (Id. at 385.) Conrad had "no acute complaints." (Id.) A neurologic check revealed no concerns. (Id. at 386 ("Alert and oriented X4, No abnormal balance, No confusion, No numbness, No tingling, No headache.").) Dr. Azmat continued Conrad on Coumadin and her seizure medications with instructions to return in three months. (Id.) An x-ray report from May 2014 notes that Conrad's pulmonary emboli were no longer a problem. (Id. at 315 ("Pulmonary emboli seen on the prior study are no longer evident, presumably resolved. No pulmonary embolism evident.").) That same month Conrad reported worsening and radiating back pain during an emergency room visit, but a physical exam found full range of motion in her extremities. (Id. at 317-18.) In July 2014 Dr. Azmat conducted a precautionary follow-up to check for pulmonary embolism. (Id. at 382.) Again in September 2014 Dr. Azmat conducted laboratory testing and checked Conrad for pulmonary embolism and vitamin D deficiency. (Id. at 378.) A CT scan revealed "[n]o evidence of pulmonary embolism in the main pulmonary artery or major branches." (Id. at 380.) Dr. Azmat noted that Conrad was "[a]lert and oriented" with no abnormal balance, no confusion, no numbness, no tingling, and no headaches. (Id. at 379.) Her psychiatric status was recorded as "Cooperative, Appropriate mood [and] affect, Normal judgment, Non-suicidal." (Id. at 380.)

In December 2014 Dr. Azmat treated Conrad for pain in her lower right extremity that had been bothering her for a few months. (Id. at 374.) The medical summary again notes that Conrad was alert and oriented with no abnormal

6

balance, no confusion, no numbness, no tingling, and no headaches. (Id. at 375-76.) Conrad's psychiatric review was also unchanged and generally unremarkable. (Id. at 376.) In January 2015 Conrad was again treated for pain in combination with weakness and dizziness for which she received prescription acetaminophen-codeine and ibuprofen. (Id. at 416.)

**B.     Record of Hearing**

The initial portion of Conrad's February 2015 hearing—approximately 30 minutes in duration—was not properly recorded. As a result, there is no recording of Conrad receiving instructions of her rights, the initial summary and admission of exhibits, the discussion of the vocational expert's ("VE") qualifications, Conrad's attorney's opening statement, and a portion of Conrad's testimony. (A.R. 32-35.) However, the hearing monitor had taken notes, and upon discovering the recording issue, the ALJ summarized the matters already discussed for the record: (1) Conrad had no objection to the VE's qualifications; (2) Exhibit 1A through Exhibit 7F had been admitted; and (3) Conrad had been recently treated for headaches and asthma. (Id. at 33-34.) The ALJ summarized Conrad's counsel's opening statement, which included a request for a post-hearing consultative examination and an assertion that Conrad had received special education which, according to the ALJ, is contradicted to some degree by Conrad's report in Exhibit 2E. (Id. at 34 (reporting that she attended school through ninth grade and took regular classes).) Conrad's counsel added that he had observed some cognitive issues and had problems interacting with his client. (Id.) The ALJ then summarized in some detail the

7

missing portion of Conrad's testimony, including a summary of her activities of daily living, her education, and a speech problem. (Id. at 34-35.) When the ALJ completed his summary, Conrad's counsel added only that there were questions about Conrad's difficulty speaking and stuttering. (Id. at 35.) The ALJ agreed and noted that he observed Conrad was having some difficulty responding to his questions as well and that she testified that she had always had speech issues. (Id.)

C. **Conrad's Hearing Testimony**

Conrad testified that she performs some cleaning tasks and can write simple things like "bread" when she prepares a grocery list, but her roommate generally takes care of trips to the grocery store. (A.R. 36-37.) She fills her daily schedule by attending church, reading the Bible, and watching television. (Id. at 37, 48; see also id. at 246 (listing television, crossword puzzles, and reading as daily activities used to maintain her focus).) She testified that she cannot ride the city bus because she would get dizzy and fall. (Id. at 38.) Conrad also testified that she can only sit for 30 minutes at a time and that she cannot walk long distances, but did not provide an estimate of the distance she can walk. (Id. at 43-44.)

Regarding her employment history, Conrad testified that she had worked in the kitchen at a Burger King for several years, but she was terminated following an argument with a customer. (Id. at 40, 45.) Leading up to her termination, Conrad had been calling in sick because, according to her, she was experiencing seizures. (Id. at 46.) In terms of her health, Conrad said that she has even "more seizures now," but could not recount how often. (Id. at 41.) She explained that she

8

sometimes seizes in her sleep and knows this because she will wake up dizzy and weak with a headache and bite marks on her tongue. (Id. at 41-42.) She believed that she experienced one nighttime seizure the week before the hearing, despite having been compliant with her medications. (Id. at 43.)

**D.   Angela Wright's Testimony**

Angela Wright testified that she is Conrad's godchild and roommate. (A.R. 49.) According to Wright, she met Conrad in 2010 and began living with her in mid-2014. (Id. at 49, 55.) Wright testified that Conrad had recently begun to physically weaken and develop fatigue and, during the month before the hearing, Conrad began experiencing dizzy spells. (Id. at 50-52.) During the six or seven months before the hearing, Wright estimated that Conrad had been seizing two or three times per week, perhaps as often as every other night. (Id. at 50, 53, 56 (clarifying that Wright did not personally witness all seizures).) During that same period, Wright also testified she helped Conrad dress, prepared Conrad's food, picked up Conrad's medication, attended Conrad's medical appointments, and did most of the work around the house. (Id. at 52.) Wright later testified that she had been cooking and cleaning for Conrad for one and a half years, meaning that she had taken on those responsibilities for nearly a year before she moved in with Conrad. (Id. at 54.) Wright also testified that Conrad cannot read at all, (id. at 53), contradicting Conrad's reported ability to read, (see id. at 37, 48, 246).

**E.     Vocational Expert's Hearing Testimony**

The VE described Conrad's prior work at Burger King as equivalent to a fast food worker position (DOT No. 311.472-010) that would be classified as light and unskilled with an SVP of 2. (A.R. 60.) The ALJ presented the VE with a hypothetical individual with Conrad's vocational profile, of advanced age and limited education who experiences seizures and episodes of dizziness, would need to avoid ladders, ropes, or scaffolding and exposure to hazards such as unprotected heights, moving mechanical parts, machinery, and open dangerous conditions, with no exertional limitations. (Id. at 60-61.) The VE opined that a hypothetical individual with that RFC could perform medium duty jobs such as hand packager, kitchen helper, and inspection inspector. (Id. at 61.)

**F.     The ALJ's Decision**

The ALJ evaluated Conrad's claims under the required five-step analysis. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). As an initial matter, the ALJ determined that Conrad met the insured status requirement of the Social Security Act through December 31, 2015. (A.R. 16.) At step one, the ALJ concluded that Conrad had not engaged in substantial gainful activity since November 30, 2012. (Id.) At step two, the ALJ concluded that Conrad suffered from severe impairments related to epilepsy and obesity. (Id.) At step three, the ALJ determined that Conrad did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (A.R. 19.) Before turning to step four, the ALJ considered Conrad's RFC to perform

10

full-time work in spite of her limitations. The ALJ determined that Conrad had the RFC "to perform a full range of work at all exertional levels," but with limitations that precluded her "from climbing ladders, ropes, or scaffolds." (Id. at 20.) The ALJ also eliminated "exposure to workplace hazards, such as unprotected heights, moving machinery, and open dangerous conditions." (Id.) At step four, the ALJ determined that Conrad is unable to perform any past relevant work, but at step five, the ALJ concluded that she was able to perform jobs existing in significant numbers in the national economy. (Id. at 25.) Accordingly, the ALJ concluded that Conrad is not disabled. (Id.)

## Analysis

Conrad argues that the ALJ erred in failing to order a consultative examination, in formulating the RFC, and in providing what she asserts is an incomplete record of the administrative hearing. (R. 17, Pl.'s Mem. at 6-8.) This court's review of the ALJ's decision is "extremely limited," asking only whether the decision is free of legal error and supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (internal quotations and citations omitted). Because the court's role is neither to reweigh the evidence nor to substitute its own judgment for the ALJ's, if the ALJ's decision is adequately supported and explained it must be upheld even where "reasonable minds can differ over whether the applicant is disabled." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In order to adequately support the decision, the ALJ must build "an

accurate and logical bridge from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (internal quotation and citation omitted). And where the Commissioner commits an error of law that is not harmless, the court must reverse the decision regardless of the evidence supporting the factual findings. *See Binion ex rel. Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### A. Consultative Medical Examination

Conrad first argues that the ALJ erred in concluding that there was no need to order a consultative examination to obtain additional medical information after the hearing. (R. 17, Pl.'s Mem. at 6.) Conrad argues that there are discrepancies related to her educational level and particularly whether she had special education needs. (Id.) According to her, a consultative examination would fill in what she contends are gaps in the evidence related to her cognitive and emotional difficulties. (Id.)

Conrad does not cite any specific information that was omitted from the ALJ's summary of the first 30 minutes of the hearing. Also, instead of citing any cases to support her argument that this case should be remanded for a consultative examination, Conrad relies on scant information in the record regarding her mental status, including a reference to Dr. Azmat's RFC questionnaire where he indicated that Conrad experiences anxiety. (Id. at 7.) Conrad also erroneously asserts that a DDE form "determined that a physical and mental consultative examination was necessary." (Id. (citing A.R. 68 (but this exhibit states that a consultative

12

examination was not required).) Moreover, Conrad relies heavily on her self-reports of feeling depressed and sad along with her counsel's personal opinion about Conrad's ability to communicate and interact with others. (R. 17, Pl.'s Mem. at 7.) However, the ALJ found her allegations to be inconsistent with the record, and Conrad does not contend that the ALJ erred in assessing the credibility of her self-reports.

As the government correctly points out, the ALJ has discretion to decide how much evidence is needed and whether to order a consultative examination. (See R. 19, Govt.'s Mem. at 2 (citing 20 C.F.R. § 404.1519a(a)).) In fact, the claimant bears the burden of introducing objective evidence that additional development of the record is necessary. *Poyck v. Astrue*, 414 Fed. Appx. 859, 861 (7th Cir. 2011). "If the ALJ denied the request for an examination, on appeal the claimant must show prejudice by pointing to specific medical evidence that was omitted from the record." *Id.* at 861. Following this standard, the Seventh Circuit has affirmed an ALJ's decision not to order a consultative examination when "no treating physician suggested work-limitations for [the claimant] because of her depression, and [the claimant had] not suggested why [the ALJ's] explanation [was] flawed." *McFadden v. Astrue*, 465 Fed. Appx. 557, 560 (7th Cir. 2012). Generally, the appropriate time to order a consultative examination is when it would provide additional information beyond what is found in the claimant's medical records. *See* 20 C.F.R. §§ 404.1519a(a), 404.1519a(b) (explaining that consultative examinations are

13

appropriate to clarify inconsistencies in the evidence or when the totality of the evidence is insufficient to decide the claim).

But an ALJ is given latitude to decide whether a claimant's medical evidence is insufficient and whether a consultative examination would fill an apparent gap. *See Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). In sum, ALJs have a duty to develop the record fully and fairly, but that does not mean that a consultative examination is required at the claimant's request. In his written decision, the ALJ examined records relevant to Conrad's mental health, even citing to records showing that she denied problems with depression and anxiety when speaking to her healthcare providers. (Cf. A.R. 18 (noting, however, that Conrad reported anxiety when dealing with her pulmonary embolism).) The ALJ also recognized that Conrad stuttered and might have a learning disorder, but whether she attended special education classes during high school was an unanswered question—that could neither be confirmed nor rejected without Conrad's school records, which are outside the scope of a consultative examination. (Id.) The ALJ also considered Conrad's post-hearing statement in combination with the record to conclude that she had no medically determinable mental impairment and did not undergo psychiatric treatment, psychological counseling, or mental health therapy. (Id.)

Here, Conrad's physician did not restrict her ability to work for any reason related to her mental health. Moreover, Conrad does not point to "specific medical evidence that was omitted from the record" to show that she was prejudiced. *Poyck*,

414 Fed. Appx. at 861. Instead, she cites self-reported symptoms and her counsel's personal opinion, neither of which is supported by specific medical evidence. *See Parker v. Colvin*, 660 Fed. Appx. 478, 482 (7th Cir. 2016) (rejecting counsel's attempt to "play doctor"). Accordingly, Conrad has not shown that the ALJ erred in declining to order a post-hearing consultative examination to evaluate her psychiatric and mental state.

**B.     RFC Determination**

Conrad argues that the ALJ made an improper RFC determination because, according to her, the ALJ did not adequately consider Dr. Azmat's opinion. (R. 17, Pl.'s Mem. at 8 (citing A.R. 307-09).) Conrad's RFC argument focuses entirely on the ALJ's assessment of her mental health and ends with another request for a consultative medical examination. In a confusing statement at the heart of Conrad's argument, she asserts, "[w]hile that treating source opinion did not only address the mental issues, it did reference that Plaintiff had anxiety." (Id.) Conrad appears to contend that while Dr. Azmat did not address her mental issues, he did check a box for anxiety. (See A.R. 307.) Conrad also incorrectly asserts that the ALJ "noted that there was no medical source opinion in the record." (R. 17, Pl.'s Mem. at 8.) That reading ignores what the ALJ actually wrote. The ALJ made reference to multiple opinions when he wrote that "[n]o treating source has offered an opinion of any greater limitation" than the opinions provided by the state agency medical consultants, Drs. Madison and Kenney. (A.R. 23.) Thus, the questions for the court are whether Dr. Azmat's opinion, which was referenced by the ALJ but

15

not considered in detail, imposed greater mental health restrictions than Drs. Madison and Kenney and, if so, whether that error was harmless.

As the ALJ noted, no doctor assessed greater mental limitations for Conrad than the state agency consultants. That is because Dr. Azmat's November 2013 opinion placed no limitations on Conrad's "ability to work at a regular job on a sustained basis." (See A.R. 309.) And a January 2014 depression screening did not identify any indication of depression. (Id. at 391.) Together Drs. Azmat, Madison, and Kenney did not identify any reason to impose mental health-based job restrictions on Conrad. *See McFadden*, 465 Fed. Appx. at 560 (agreeing with an ALJ's decision against ordering a consultative examination when no treating physician had suggested work limitations and claimant had not pointed to a flaw in the ALJ's reasoning). Conrad has not identified any such restriction, nor has the court's review of the record revealed any evidence to support her argument that she suffers from mental limitations not adequately incorporated in the RFC assessment. *See Buffolino v. Colvin*, No. 12 CV 50245, 2015 WL 1285277, at *5 (N.D. Ill. March 20, 2015) (rejecting argument that ALJ inadequately analyzed the medical records to develop an appropriate RFC when plaintiff's brief "has done the same by merely citing to the record without analyzing the medical records or explaining how they support [claimant's] argument"); *Cabrera v. Astrue*, No. 10 CV 4715, 2011 WL 1526734, at *12 (N.D. Ill. April 20, 2011). Accordingly, Conrad has not shown that the ALJ committed any error in analyzing her limitations related to mental health in formulating the RFC. And because Conrad has not raised any challenge to the

ALJ's physical RFC assessment, any potential challenge to that aspect of the decision is waived.

C.  **Hearing Record**

Last, Conrad argues that a new hearing is necessary to remedy the missing initial 30 minutes of her hearing. (R. 17, Pl.'s Mem. at 8-9 (citing HALLEX §§ I-1-0-1, I-2-6-40(A)).) As the hearing transcript makes clear, the ALJ was alerted to the miscue by the hearing assistant who had been taking notes from the start of the proceeding. (A.R. 33.) The ALJ then orally summarized on the record what had been discussed up to the point when the hearing assistant realized that the recorder had not been activated. (Id. at 33-35.) When the summation was complete, Conrad's counsel noted that the ALJ had also asked about Conrad's trouble speaking and stuttering before agreeing, "[t]hat was the only thing I would add." (Id. at 35.) Conrad has not explained how any of the statements made off the record might have changed the ALJ's decision or otherwise described any prejudice stemming from any omission. The impact of the off-the-record discussion is further diminished by Conrad's counsel's affirmance on the record that the ALJ's summary of what had transpired up to that point was accurate and complete.

The relevant statute requires the Commissioner to "file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based." 42 U.S.C. § 405(g). The HALLEX law manual, which governs how each ALJ is expected to conduct hearings, addresses the very issue

17

that arose during Conrad's hearing. The HALLEX law manual instructs the following:

> If the hearing assistant or VHR discovers during the hearing that there are partial omissions or that portions of the hearing recording are inaudible, he or she will immediately alert the [ALJ]. After determining what information is missing or inaudible, the ALJ will:
>
> - Summarize the missing testimony or questioning;
>
> - Verify the summary's correctness and accuracy with the claimant and representative, if any, on the record; and
>
> - Read the summary into the record.

HALLEX § I-2-6-46(A). The ALJ complied with these instructions by reciting what had happened and granting Conrad's counsel an opportunity to supplement the record. *See id.* Conrad's counsel had one point to add after the ALJ completed his summation, it was recognized on the record, and the hearing moved on. (A.R. 35.) Because the ALJ complied with the law manual and Conrad has shown no prejudice stemming from the off-the-record portion of the proceeding, the recording error does not require a remand.

## Conclusion

For the foregoing reasons, Conrad's motion for summary judgment is denied, the government's is granted, and the Commissioner's final decision is affirmed.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**